of Pittsburgh, Pennsylvania. I am going to reserve a little time for rebuttal, and I'll watch the clock, as you've indicated. I want to address two issues in this argument. I'm going to address the issue concerning whether National Union is entitled to judgment as a matter of law on the basis of the statute of limitations.  breach of contract claim under the Diamond Heights analysis, and whether the reversal of the bad faith judgment is required, given the legitimate dispute of coverage under Diamond Heights and the absence of proof of bad faith. First, the district court erred here by applying Diamond Heights in the broad manner that it did. It essentially rewrote the parties' contract to require National Union and excess insurer to either agree to a settlement or volunteer to assume the defense when the... Let me help. If you can help me on this. Obviously, the clear language says that your client has to agree. All right, and that didn't to the settlement. Right. But there's also written in all of these, there's an implied condition of good faith and fair dealing, correct? Correct. So, why can't we reconcile Diamond Heights as explaining that particular condition? Yes, you have a right, you know, you do have a right to have input and to agree, but if that's exercised in a way that violates the interest of good faith and fair dealing, which Diamond Heights talks about, there are reconcilable if that's what, in fact, it does. Diamond Heights does that, but it doesn't apply in this situation. It carves out a very, very narrow situation where the insured has all but been abandoned, there's been a denial of coverage, you're on the eve of trial, and you're just about to go out to trial. That wasn't what was going on here. Okay, so I guess I'm just trying to get my head around all of this from the standpoint. I know what your contract says. So, if you are to, and Diamond Heights sets out another way that, you know, where there are instances where it might not be necessary and you go through all of these. So, I'm understanding you to say that Diamond Heights can be reconciled with the implied good faith and fair dealing that's in any contract, but you're just saying your client didn't violate Diamond Heights. Or I understood you to say a little more that Diamond Heights. I believe that Diamond Heights under the law of California now, the way it is written, and given the California Supreme Court. You're relying on Waller? On Waller. Because Waller has recognized that there's not going to be an applied waiver of contract offenses. Other states, very few minority states have recognized that, but California is not going to do that. And you have to show a waiver by clear and convincing evidence. And here, under the facts of this case, there just wasn't any waiver. National Union became involved in the case. It promptly sent out an acknowledgment. It investigated the case all along. When this issue came up, it was, I'm sure I'm going to hear from my opponent, but they didn't attend the mediation. But the primary insurer, who has the defense obligation here, they told us they didn't attend. They didn't authorize anything to the settlement. And Diamond Heights and this whole equitable notion that it applied in that case was being yielded, in this case, more like a sword. It wasn't an equitable situation, necessarily. Here we asked for ---- They're going to argue, I'm sure, that when all of this was going on, that they said, hey, this is that we want to settle it. If you don't want to agree, then take over the defense. And they're going to say that you just were kind of wishy-washy about that and you didn't do it and they were in a jeopardized situation, and so they went ahead and did it, and then they sued you. Well, I would disagree that there's absolutely ---- Is there an instance where you could wait too long? Or do you just always get to say, we don't want to settle and we're not going to take over the defense and ---- Again, it does depend on the facts of the case. So there would be a situation where you would agree that you could wait too long to not say you'll take over the defense. I would think there would have to be almost a complete abandonment of the insured, like there was in Diamond Heights, where you're denying coverage. That's an exception. You're denying coverage, you're refusing to take over the defense, and you're unilaterally at the very brink of trial saying, no, I'm not going to contribute to the settlement. But that was not what was going on here. So how long did you have? Again, it would depend on the facts of the case. But what are the facts of the case? The facts of the case here is that the excess insurer was investigating, and what we had here was not in like Diamond Heights, where liability was certain. Diamond Heights was a construction defect case. So liability had been admitted. They knew what the property damages were going to be well into the excess limit. Here we have liability is uncertain, really very uncertain. We're being told before the mediation, we're going to win this case, we're not going to settle it. And then suddenly, once they lose summary judgment, everything changes. And, sure, good faith is a two-way street. Both parties have a duty to exercise good faith. And I think, I mean, really what was going on here is they wanted to settle their patent claim and package a whole deal. And they did that systematically by first going after the primary. There's already a little backdrop over that the Federal Circuit said they have a patent claim, right? The Federal Circuit first found. Because there had been some. Right, the case had been stayed. It was on appeal. Well, but the Federal Circuit reversed. Right, and then they came back and said they had the patent claim. But we are not involved in the patent claim. The only issue here is the counterclaim under the trade disparagement. Right, and so then you have to look at, you know, was it collusive or anything along those lines? Because what they settled, the counterclaim, then it comes out of the patent claim, and then that's what their net gain is. They get $8.75 million. But then they subtract the four-point-something, and then that's what's left. But the jury, if we sort of go fast forward, the jury said that wasn't collusive or unreasonable, right? Well, I don't think our argument is you don't even get to that point because it shouldn't have been submitted to the jury. Well, yeah, you have to say that because otherwise if you get to that point, that's a tough rock to push uphill. And I do think there is strong evidence that that collusion was going on here. But if you're going to accept the district court's ruling here, then that opens the door. A primary insurer, there's often cases where the cost of defense is going to be extremely expensive. But that's what they contract to provide. You can't force an excess insurer to step in and prematurely defend the case. That's not how these policies are set up. But the primary was only, what, a million? A million. But there's many cases, Your Honor, for example, like a quadriplegic personal injury case where there's no liability really and the damages are extremely high and they're expensive. The primary can't just enter California law. It's clear. Here's my limits. I'm out of here. I'm not going to defend the case. And there's no evidence in this record that that's what was going on. I believe if you look at the timeline that's set up, even stipulated to by the parties under here, there's just no support that this case should have been submitted to the jury under any type of equitable or Diamond Heights theory. But if you had taken over the defense, how long did you have to take over the defense? Here I would say we really didn't have any obligation. Okay, but how long in terms of when they notified you in terms of the letters? So in terms of the letters, they first demanded a defense in I think it was the August 13th email. They sent an email. And we in the meantime had been talking all along, and we respond back, okay, we get your email, we are considering this. The next day, boom, another hammer letter saying the same thing, settle, we're under jeopardy here. There's no evidence in this record that they were ever under jeopardy. In Diamond Heights, they were going to go out to a jury. The trial date in this case hadn't even been set. There's still discovery to be done. My client sends a letter to them and say, we do not believe that this case has merit. We want to work with you and resolve this case, but we also don't have an obligation at this point to take over the cost of the defense. Okay, so for you to win is a matter of law, which I think that that's what you're asking here, right? Right. That we have to give them all inferences as true, right? So all inferences, if you give them all inferences as true, what was the time span from when they start telling you you need to make a decision and take over the defense? You give them all inferences as true because you're asking us to, for you to win is a matter of law, right? I don't think it's as simple as that, but yes, the time frame was. Well, where am I wrong then? If you want to win, you essentially want to win as a matter of law. I think as a matter of law. I can't weigh the facts then, okay? They would be entitled to all the inferences. So what are the inferences that they can say for you to win as a matter of law? Let's say if it was undisputed that they gave you one day, okay? And that's what they said, they gave you one day. Then you have a really good argument, right? They're going to come in and say we gave you weeks. What are the, if you want to win as a matter of law without resolving factual disputes, what are the outside of the facts that they allege? So if you look at the simple timeline here towards. . . Just tell me how long you had. How long we had? Giving them all inferences in their favor. All inferences in favor. They did not give us a deadline on April 14th when to respond. They knew we were still considering whether to take up the defense. Over the weekend they settled the case. They don't even tell us now we've unconditionally settled the case until after it's settled. So I think we had no time to pick up the defense as a matter of law. How much time was there from the earliest advice that you had received that this was in the works until the actual settlement? How many days or weeks? The settlement was. . . You're having a hard time with this question. It's not that hard. In March. . . So it was in March they obtained the primary, conditionally said, okay, if you can get this settled, we'll contribute. So then we're into April when we are still investigating at that time because they didn't even give us the materials we needed to investigate the case, and we have a right to those materials. So we continue to investigate, and then in April 13th they send us this letter and says pick up the defense or accept the settlement. We tell them we're considering doing that, and then, as I said, they go ahead and settle over the weekend and we're. . . What was the actual date of settlement? The date of the settlement I believe was April 18th, and they notify us on April 19th. So like around six weeks. My time is up, so I would reserve for rebuttal unless there's further questions. You may do so, Counsel. Thank you. We'll hear from your opponent. May it please the Court, James Martin for LMA and Teleflex. I would, with the Court's indulgence, like to walk through that timeline if I could, that was asked about how long did they have to evaluate. Very well. First of all, the issue is when faced with the reasonable settlement offer, did they have a reasonable opportunity to evaluate the offer? That's the issue. And the evaluation is done under the Johansson instruction that was given here, which is did the liability look like it was excessive relative to. . . I'm sorry. Did the liability issues with the exposure look excessive relative to the settlement? So was the settlement reasonable when you considered liability and when you considered the demand? So what we have to know is when did they know about the demand, when did they have the facts related to liability, and finally, how did that get folded into the settlement process at the end? Now, this all started two years before the settlement. National Union was on notice of the potential for excess liability and had access to all information possessed at that point by LMA's trial counsel. Eighteen months before the case settled, they had AMBU's demand letter at $30 million. They knew of the potential for coverage and knew that the settlement, if one was ever made, would go over the $1 million primary layer. Eight months before the settlement, Mr. Manger came on board. This was the claims person. He got up to speed. He received a detailed case report and a liability analysis and an access to the defendant's database. Five months before the settlement, National Union got another update advising that the case was going to go to trial because the summary judgment was denied. Four months before the settlement, National Union got AMBU's mediation demand, which included now a $28 million exposure and an expert report showing $9.8 million to $12 million in actual damages and also the report indicated the defense costs were going to be significant. Three months before the settlement, National Union got a full report on the mediation and it was advised of the conditional deal that became the settlement, including that the covered part of the case with the primary contribution could settle for $4.75 million or $3.75 from the excess carrier. And National Union was told that that proposal was only going to be open until February the 18th, a date that was extended twice, and it needed to contribute in order to finalize this deal. It also knew that the clock was running because CNA, the primary at that point, three months out, was considering tendering its limits, which would put the deal together. Two months before the settlement, in response to National Union's request, Mr. Marzin, who was the trial counsel for LMA, re-forwarded documentation about the case that National Union already had, including the mediation proposal. Now, at that point, National Union said, hey, we're still not sure about the reasonableness. We want a liability and damage analysis on this case. LMA said, wait a minute, you already have that. You've had it for months. You've had it since the mediation. And Mr. Manger said, we want to hear it from trial counsel. What does Mr. Marzin think? He's in the best position to know whether this offer was reasonable. At that point, the deadline for the settlement was extended to April 4, and one month before the settlement, Mr. Marzin gave his detailed report. And you know what he said, what he'd been saying all along, this is a reasonable deal based on my analysis of the case and the facts. That's met with silence. We don't hear anything. Then March 25, three weeks before the settlement, National Union sends a list of questions about the case. And Mr. Marzin gets on a call and addresses every one of those questions. Now we're up to April 14, 10 days after the offer has expired, and we tell National Union we're going to finalize this deal next week. And between Mr. Marzin getting on that call and answering those questions and our indication to them that we were going to settle, we heard nothing. The next communication we got after we indicated that we had settled the case was three days later when they offered to pick up the defense. Now that's the case that the jury heard. And there is no material to that. All of these dates that you've given us, did this all come out in the jury, in the case? Yes. In fact, Your Honor, our trial counsel took Mr. Marzin step by step through these interactions in his testimony. The jury heard all of that. Equally importantly, the jury heard their explanations for why their conduct was reasonable. But this case then went to the jury under proper instructions that came straight from California black letter law, encompassed both the breach of contract analysis that California law insists on and the reasonableness or unfairness analysis for bad faith, and National Union lost. They don't get a redo now. And the only lingering question after that is, does Diamond Heights fit this case? Well, the analysis in Diamond Heights didn't relate to the time of trial. It didn't relate to any sense of urgency. In fact, it states a proposition that is decades old under California law. If a reasonable settlement offer is presented and there is time to evaluate it, the conditions in the insurer's policies are affected by the covenant of good faith and fair dealing. They don't get to bring those conditions back. Rather, they have options. They can contribute to the settlement, they can take over the defense, or they can do nothing. If they do nothing, they risk what happens that's in front of this court right now. Well, now, if it's wrong that Diamond Heights just doesn't apply here at all, that would be a pretty serious error, right? It would be a serious error, but Diamond Heights certainly, on its facts, when you look at the historical backdrop for the case and read Justice Strankman's opinion, and you couple that with the Fuller-Austin case that came after and the Safeco case from Justice Elan, Diamond Heights fits this case perfectly. There was a reasonable settlement doctrine in California that applied to primary insurers who had reserved their rights, that applied in favor of excess insurers dealing with primary insurers, and what Justice Strankman did was simply extend that concept to dealings between the primary insurer and the excess insurer when a settlement offer was presented that invaded the excess layer. Do you want to say something about the Waller case? Well, a couple things about Waller. The first is that the Waller issue here doesn't belong in this case. It was waived. But how do we reconcile the two? How can Diamond Heights be reconciled with Waller's rule that waivers of policy provisions must be clear and unequivocal? So the first point on Waller is, of course, that the issue is waived under the instructional error analysis. They never offered an instruction on Waller. They didn't object to the instructions that were given. The trial court expressly found in its opinion that their lack of objection, in fact their statement of no objection to the instructions that were given, obviated any need to consider Waller and the clear and convincing burden of proof. That record is not disputed. The exercise of discretion by the court in applying Rule 51 eliminates the need to get to Waller. But Waller, in fact, is reconcilable, as the court said, with the Diamond Heights analysis. Keep in mind, Your Honor, that Fuller-Austin is after Waller, and it goes ahead and applies the Diamond Heights rationale in a bankruptcy settlement context without any indication that the Waller waiver principle is relevant or applies. The Waller waiver principle is one that would apply if the insured was claiming coverage based on the waiver of a policy condition. That is not what this case was about at trial. This case was about a breach of contract, on the one hand, and bad faith on the other. And no case has ever said that either of those issues, as the trial court concluded, trigger a clear and convincing evidence burden. Second, the Waller waiver analysis has never been applied in the reasonable settlement context. Insurers reserve their rights in this context all the time. They do not, because of the covenant of good faith and fair dealing, get to rely on those conditions when the insured goes ahead after it's been abandoned and makes a settlement. No case has said that in the reasonable settlement context we can bring waiver back into the picture. And you couldn't, because if waiver under Waller applied here, this doctrine would not exist anymore for primary insurers or anyone, because what would the insurer do? They would do exactly what National Union did here. They would say, hey, we never consented to that, therefore we didn't waive it, therefore the reasonable settlement doctrine has nothing to do with this case and we can defense it. California law says no to that. Based on the covenant of good faith and fair dealing, the insurer does not get to bring those conditions back in, notwithstanding Waller, which doesn't talk, I might add, Your Honors, about the burden of proof in this context at all. The last point on Waller, of course, is that the court found that even if this instructional error existed, which it didn't, even if Waller conceivably applied, which it doesn't, the error in fact was harmless because of the overwhelming evidence in front of the jury that substantiated this case under Diamond Heights. Now, the Diamond Heights rationale, to close out, Your Honors, applies to this case because it is specific in its application to settlement offers that occur in the context of primary and excess insurance, where the offer exceeds the primary limits and goes into the excess layer and the excess insurer's participation would be necessary for the settlement agreement to be recognized and consummated. That's exactly the way the doctrine works with primary insurers. It's the way it works when an excess insurer invokes it against a primary insurer and the policy conditions which have been reserved do not apply anymore, and they don't apply because the insured is allowed to buy its piece, the principal overlay of liability insurance, and because of the systemic interest in promoting settlement, both of which were vindicated by the application of Diamond Heights here and then vindicated, of course, by the jury's verdict. Unless the Court has further questions, we would submit. No further questions, Counsel. Thank you. Parsonson, you have some reserve time. First of all, I want to hit right up front that the timeline, in our opinion, is really a red herring. You have to look at the total facts. Diamond Heights just doesn't apply. But didn't you, in your opening presentation, emphasize the lack of notice or the shortness of notice? Well, I think in response to your questions and what really if you're looking at what is the purpose of these non-consent clauses is to prevent just what happened here for an insurer to decide, pick a settlement, fait accompli, the cases talk about, and then pressure the insurers to accept when liability here was just not certain. This was not a strong disparagement case. And there was also, I've heard repeated statements of going into the excess layer. This is not a case where the damages were ever going to go in our excess layer. We exercised good faith in evaluating the claim every time they gave us information. I'm not going to go through the timeline again. Did the jury find against you on that? But our point is it should not have been as a matter of law submitted to the jury. This Diamond Heights, if you apply it in this way, you're virtually eliminating these consent clauses in excess policies. But when you grant something as a matter of law, it's because no one could disagree on it, and the jury unanimously disagreed on it. Well, that wasn't the issue. What was presented to the issue to the jury here was they have to assume that we had an obligation to take over the defense and then determine if what we did was reasonable, if the only way we could get around it, if the settlement was unreasonable. We never had an obligation in the first place to take over this defense, and we never acted in bad faith. We have properly evaluated the materials given. We requested them. We wanted to know why the assessment had suddenly changed and that was going on. Thank you, counsel. Your time has expired. Thank you. The case just argued will be submitted for decision.
judges: O'scannlain, Rawlinson, Callahan